## In re Fox Film Corporation.

*Roberts & Montgomery*, for appellant; *J. R. Jones*, for Board of Censors.

McDevitt, P. J., July 19, 1928.—This cause came before the court on appeal from the final order of disapproval of a film constituting a motion-picture play, "She's Still My Baby."

This appeal presents the questions *(a)* whether, under the Act of May 15, 1915, P. L. 534, the Board of Censors has jurisdiction to require the submission to it for approval of such language as may be used in conjunction with the exhibition of a film either by means of a mechanical device or by the use of persons; and *(b)* whether the board has not been guilty of an abuse of discretion in failing to approve the film "She's Still My Baby" when it has not found that said film is sacrilegious, obscene, indecent, immoral or such as tends, in the judgment of the board, to debase or corrupt morals.

The Pennsylvania State Board of Censors of Motion Picture Films as presently constituted was created by the Act of May 15, 1915, P. L. 534. Since its creation, the board has been engaged in the performance of the duties imposed upon it by said act in accordance with such rules and regulations as it has, from time to time, announced.

From the early beginnings of motion pictures up to approximately eighteen months ago the motion-picture art had not progressed beyond the point of being able merely to record and reproduce pictures upon a screen. About eighteen months ago, two different devices, which had previously been invented and perfected, were first used in motion-picture exhibitions, which were an outstanding advance in the development of the art and which made possible the reproduction of the voices of the actors in synchronization with the picture reproduced on the screen.

The two devices, known as the Movietone and the Vitaphone, respectively, which have finally succeeded in synchronizing language with pictures are not the same principle. The Movietone records the sounds directly upon the emulsion or film in the form of a series of horizontal lines varying in density with the variations of light at the time the sound was recorded. The sound is then reproduced in synchronization with the picture by means of an attachment placed upon the standard projecting machine, which, by a combination of electrical and mechanical processes, turns the light variations on the film into sound. Without such an attachment on the projecting machine, the film can be shown in the regular way without reproducing the sounds recorded thereon.

The Vitaphone is a device which reproduces sounds in the same manner as a phonograph. The sound is recorded upon a round disc which revolves on a turntable. Into the grooves on the disc a needle connected with a sound-box is inserted. The projection machine used to exhibit the picture is timed with the sound-producing machine through the operation of a motor common to both machines, which keeps the speed of the two uniform.

For a period of approximately eighteen months the use of these two devices has been gradually extended until at the present time a total of approximately 300 motion-picture theatres have been equipped to use them. The development of these devices and the installation in and equipment of theatres to use them represent a very large investment totaling several million dollars.

The appellant, Fox Film Corporation, has exclusive rights in Pennsylvania and throughout the United States as sole distributing agent for the Fox Film Corporation which produces the subjects known as "Fox Movietone News" and "Fox Movietone Entertainments." The Fox Movietone features are produced by the appellant, Fox Film Corporation.

Prior to the submission to the Board of Censors for approval of the particular film which is the subject of this appeal no effort had been made by the board to regulate in any manner the utterance of language or reproduction of sounds in synchronization with the exhibition of a film, so that for the said period of approximately eighteen months during which the Board of Censors made no effort to assert any power of control over the reproduction of sound, the Movietone invention was developed, many pictures were filmed with Movietone accompaniment, and many theatres were equipped to reproduce sound and picture simultaneously.

On or about April 16, 1928, the Board of Censors notified the appellant, Fox Film Corporation, that in the future it must submit to the board for examination all language which was proposed to be used by means of any mechanical device or by the use of persons in conjunction with the exhibition of a film. The board also caused to be printed upon the form of application for examination of all films to be submited to it the following requirement: "State whether or not this film is to be exhibited in conjunction with any mechanical device, or by the use of persons, for the utterance of language. . . . If so, submit such language."

On April 25, 1928, the appellant presented to the board the application for the approval of a film constituting a motion-picture play "She's Still My Baby," a copy of which application is attached to the answer filed by the board to the appellant's notice of appeal. As will appear upon reference to said application, the appellant, in response to the above-quoted requirement printed upon said application, answered "yes" to the inquiry whether the film was to be used in conjunction with a device for the utterance of language, and further stated: "Upon advice of counsel we refuse to submit such

language upon the ground that this requirement is beyond the authority and/or discretion of the Board."

The board thereupon examined the said film and disapproved the same "for the reason that the said Fox Film Corporation has refused the request of the Board to submit to it for its examination the language used by the actor in said picture which is proposed to be exhibited in connection with a mechanical device for the utterance of the language of such actor." The Fox Film Corporation appealed from the said order of disapproval and the board thereupon re-examined the same and finally disapproved the said film for the same reasons upon which it was originally disapproved.

The board did not find, either in the original or in the final order of disapproval, that the said film was sacrilegious, obscene, indecent, immoral or such as tended, in the judgment of the board, to debase or corrupt morals.

On May 10, 1928, the Fox Film Corporation accordingly filed its appeal from the final order of disapproval of said film by the Board of Censors.

It is provided in section 1 of the Act of May 15, 1915, P. L. 534, "that the word 'film' used in this act means what is usually known as a motion-picture film."

"Sect. 6. The board shall examine or supervise the examinations of all films, reels or views to be exhibited or used in Pennsylvania; and shall approve such films, reels or views which are moral and proper; and shall disapprove such as are sacrilegious, obscene, indecent or immoral, or such as tend, in the judgment of the board, to debase or corrupt morals. This section shall not apply to announcement or advertising slides.

"Sect. 21. No banner, poster or other like advertising matter shall contain anything that is immoral or improper. A copy of such banner or poster shall be submitted to the board.

"Sect. 22. This act shall be enforced by the board. In carrying out and enforcing the purposes of this act, it may adopt such reasonable rules as it may deem necessary. Such rules shall not be inconsistent with the laws of Pennsylvania.

"Sect. 24. Every person intending to sell, lease, exhibit or use any film, reel or view in Pennsylvania shall furnish the board, when the application for approval is made, a description of the film, reel or view to be exhibited, sold or leased, and the purposes thereof; and shall submit the film, reel or view to the board for examination; and shall also furnish a statement or affidavit that the duplicate film, reel or view is an exact copy of the original film, reel or view, as submitted for examination to the board; and that all eliminations, changes or rejections made or required by the board in the original film, reel or view has been or will be made in the duplicate.

"Sect. 26. If any elimination or disapproval of a film, reel or view is ordered by the board, the person submitting such film, reel or view for examination will receive immediate notice of such elimination or disapproval, and, if appealed from, such film, reel or view will be promptly re-examined in the presence of such person by two or more members of the board and the same finally approved or disapproved promptly after such re-examination, with the right of appeal from the decision of the board to the Court of Common Pleas of the proper county."

Section 27 provides that for any violation of the act, upon conviction thereof, the sentence shall be a fine of not less than $25 nor more than $50 for the first offense, and not less than $50 nor more than $100 for any subsequent offense, with a provision for imprisonment in default of payment of such fine and costs as might be imposed.

The powers conferred upon the board and the duties imposed upon an exhibitor are set forth in paragraphs 6 and 24, respectively, of the Act of 1915. The powers conferred upon the board by section 6 are as follows: "The board shall examine or supervise the examinations of *all films, reels or views to* be exhibited or used in Pennsylvania; and shall approve such films, reels or views which are moral and proper; and *shall disapprove such as are sacrilegious, obscene, indecent or immoral,* or such as tend, in the judgment of the board, to debase or corrupt morals."

The duties of an exhibitor as defined in section 24 are as follows: "Every person intending to sell, lease, exhibit or use any film, reel or view in Pennsylvania shall furnish the board, when the application for approval is made, *a description of the film, reel or view* to be exhibited, sold or leased, and the purposes thereof; and *shall submit the film, reel or view to the board for examination;* and *shall also furnish a statement or affidavit that the duplicate film, reel or view is an exact copy of the original film,* reel or view, as submitted for examination by the board; and that all eliminations, changes or rejections made or required by the board in the original film, reel or view has been or will be made in the duplicate."

Bearing in mind the fact that the word "film" is defined by said act as "what is usually known as a motion-picture film," let us compare the powers of the board with the regulation which they seek to put into effect and with the jurisdiction which they seek to assert. The board seeks to impose the following requirement upon the application for approval of each film: "State whether or not this film is to be exhibited in conjunction with any mechanical device, or by the use of persons, for the utterance of language. . . . If so, submit such language."

It is obvious that no authority for the imposition upon an applicant of such a requirement is contained in or comprehended by the power given to the board to examine "all films, reels or views." It is also obvious that no such requirement is included among the duties imposed by the act upon an applicant; the act merely requiring that the applicant give the board a description of the film to be exhibited, submit the film for examination, furnish an affidavit that the duplicate film is an exact copy of the original, and a statement or affidavit that all eliminations made by the board in the original film will be made in the duplicate.

The regulation of the board, therefore, is an obvious attempt to extend its jurisdiction beyond that conferred upon it by the legislature. It is an attempt on the part of the board to step out beyond the confines merely of examining and approving or disapproving "all films, reels or views" and to appropriate to its jurisdiction the censorship of any language or music used in connection with the exhibition of a film, whether the same be uttered by a person actually on the stage or by means of a mechanical device. Indeed, the position of the board, as stated by its counsel in the brief filed by him in the appeal by Vitagraph, Inc., raising the same question as the instant appeal, reveals an intention on the part of the board to extend its jurisdiction far beyond even these arbitrary boundaries so as to cover the entire "exhibition as a whole" of moving-picture films. It is stated on page 13 in said brief: "*. . . the exhibition as a whole as the same is proposed to be made publicly in this State is subject to the power of the board* in order to determine whether or not the pictured play and the necessary as well as the intended accompanying language is 'moral and proper.' " Again, on page 17 of the brief filed by counsel for the board, it is stated that the Board of Censors has ". . . all the power

that is needful for it to determine the quality of the motion picture, play *or exhibition* proposed to be publicly given in this State."

It is significant that the present attempt of the Board of Censors arbitrarily to extend its jurisdiction, as indicated by the regulation which it is seeking to enforce, is the first attempt on the part of motion-picture censors to censor spoken language, and that even the Pennsylvania board apparently never thought of attempting thus to extend its jurisdiction for a period of approximately a year and a half after the use of mechanical devices for the synchronization of language with a picture film.

A comparison of the Act of June 19, 1911, P. L. 1067, the first censorship act, with the Act of May 15, 1915, P. L. 534, is of considerable help in ascertaining the intent of the legislature with respect to the limitations upon the powers of the board. In the first place, the Act of 1911 was entitled "An act *regulating the exhibiting or using of moving pictures* and stereopticon views. . . ." The Act of 1915 is entitled "An act relating to motion-picture films, reels or stereopticon views or slides; providing a system of examination, approval and regulation thereof, and of the banners, posters and other like advertising matter used in connection therewith; creating the Board of Censors, and providing penalties for the violation of this act." It is to be noted that the first Act of 1911 was considerably broader in scope than the Act of 1915; the Act of 1911 conferred the power to regulate the exhibiting or using of moving pictures; the Act of 1915 provides a system of examination, approval and disapproval of motion-picture films, reels or views. The argument in support of the position of the board would have more force if it were based upon the Act of 1911 rather than the Act of 1915.

In the second place, the legislature, in the Act of 1915, not only narrowed the scope of the former act as defined in its title, but expressly conferred upon the board the right to examine all films, reels or views, and, in addition thereto, the power to examine and censor "banners, posters and other like advertising matter." The legislature would certainly not have deemed it necessary to give to the board express authority to censor banners, posters and advertising matter (which power has not been expressed in the Act of 1911) if the board already had, as an incident to the powers conferred upon it, the right to control "the exhibition as a whole" of motion-picture films publicly shown in the State.

In the third place, it is to be noted that the Act of 1911 contains no definition of "moving pictures" or of "film." In this respect, also, the legislature in the Act of 1915 limited the scope of the prior act by defining "film" as "what is usually known as a motion-picture film." Here lies the crux of the whole matter. The board announces that it will no longer act as censors merely of what is usually known as a motion-picture film, but that it will in the future censor the entire exhibition of which the motion picture is a part. Such authority once asserted by the board will undoubtedly lead to the effort by the board to censor indirectly anything and everything connected with the exhibition of a motion picture, including the music, the language, the program, and conceivably even the decorations in the theatre in which a picture is exhibited, or such other performances, as, for example, vaudeville acts, as may be given on the same program with the motion picture. That such power in the board was not contemplated by the legislature is self-evident upon the mere statement of the proposition.

It cannot be argued with any force or conviction that the legislature, by giving the board the power to examine and approve or disapprove of a motion-picture film, as it existed in 1915, the year the enabling act was passed,

intended to clothe the board with authority to censor the language of President Coolidge, for instance, who might be filmed while delivering an address, or to censor the address given by an explorer or traveler in person upon the stage in conjunction with a travelogue. The educational value of the Movietone invention would be entirely destroyed by such an assertion of authority, for the producer could make no record of any public address unless the speaker first submitted to the photographer the manuscript of his speech, to be censored by the Pennsylvania Board in advance, and the address of an explorer, given in conjunction with a travelogue, could never be delivered extemporaneously.

The board contends in support of its position that, without knowledge of the language proposed to be uttered in connection with a motion picture, it is impossible to determine whether the motion picture is moral and proper or whether it is sacrilegious, obscene, etc. This position is perhaps ingenious and astute, but it is obviously an attempt to do by indirection what it apparently realizes it has no direct authority to do. While conceivably it may be desirable for the board to have the right to demand the submission of language used in conjunction with a motion-picture film in order to ascertain whether the film is moral and proper, that is a matter which must be addressed to the legislature, for neither the board nor the court, by judicial legislation, can create such a power if not conferred by the act of assembly. It must be borne in mind, therefore, that the issue raised by this appeal is not whether the board should have the power to censor language, but whether such power has been conferred upon it by the Act of 1915.

It cannot be contended, of course, that by reason of the limitations placed upon the powers of the board by the Act of 1915, a motion-picture exhibitor can, therefore, with impunity use such language in conjunction with a motion-picture film as may be immoral, sacrilegious or obscene. There is ample legislative authority quite apart from the Censorship Act to enable the proper authorities to close an indecent public exhibition and to punish such persons as may be guilty of exhibiting indecent pictures or plays. The Acts of April 13, 1911, P. L. 64, and of May 20, 1913, § 16, P. L. 229, establish effective remedies for the control and punishment of such persons as may be inclined to produce improper public exhibitions. A committee of theatrical censors has been and is functioning effectively in the City of Philadelphia, which, under the authority of legislative acts, controls the production of the spoken drama.

The board admittedly has jurisdiction to censor the titles and sub-titles which are printed on the film. Such titles are an integral part of the film and of the story which is depicted thereon. Counsel for the board contends that, admitting the power of the board to censor language printed on the film in the form of sub-titles, and denying the authority of the board to censor language which is spoken by an individual or mechanical device in conjunction with the film, is a distinction which is unsound, because it is based upon whether the language is printed or spoken. The board contends there should be no such distinction. But the authority of the board arises solely from the act which created it, and, however desirable it may be to censor spoken language as well as printed language, jurisdiction over the former was not conferred upon it by the legislature.

Certain well-established rules of construction must be borne in mind when an act is to be construed. Clear language is to be construed in exact accordance with what it says, and the language of an act which is complete and clear in itself cannot be extended, even though a court may think such exten-

sion might have been wise. In the second place, a penal act is always to be strictly construed.

Upon the first point, a clear statement of the rule is found in the case of Grayson v. Aiman, Inc., 252 Pa. 461 (1916). In this case the court considered the Act of 1891, which provided that where goods subject to distress for rent passed into the hands of an assignee for the benefit of creditors, a landlord should have a preference for rent from the proceeds of the sale of such goods. The question was whether the act gave the same preference where the goods were sold by a receiver instead of by an assignee for the benefit of creditors. The court said: "The argument concedes, of course, that it is the legislative intent that governs in all statutory construction, but it overlooks the fundamental rule that courts, in seeking for the legislative intent, must find it in the statute itself; that unless good ground can be found in the statute for restraining or enlarging the meaning of its words, the courts may not subtract therefrom or add thereto. Another equally fundamental rule overlooked is, that where the words of a statute are plain and clearly define its scope and limit, construction cannot extend it. Were it to be conceded that preference in cases of receivership fall within the spirit of the Act of 1891, while this would establish the equity appellant contends for, it would come far short of establishing a statutory right which alone can give relief. Any so-called equitable construction that would so extend the Act of 1891, or that of 1772, as to include the relief therein provided for cases arising under receiverships, in view of the plain and unambiguous language of the act defining and limiting its application, would be nothing less than supplying a supposed defect in the act which the legislature could have easily supplied. It would not be construing the act, but altering it. And this we may not do."

In the case of Com. v. Kebort, 212 Pa. 289 (1905), the court considered an Act of 1895 providing against the adulteration of food. The act provided that the word "food" "shall include all articles used for food or drink." The court held this section unconstitutional on the ground that the title of the act referred only to food, and that food, in common understanding, did not include drink. The court said: "The words food and drink, in common usage and understanding, are complementary and associate terms denoting the two prime necessities of life, but they are so far from synonymous that they import a plain and fundamental distinction, as universal as language and as old as the human race. No tongue is so primitive that it lacks different words to indicate them and different words to express the sensations of want of them, as hunger and thirst."

It may be observed at this point that the vocabulary of the legislature is doubtless large enough to include different words to indicate things heard as differentiated from things seen, and that had the legislature intended to give the Board of Censors jurisdiction over language it could easily have done so.

The rule of strict construction applicable to penal statutes has often been defined. In the case of Stewart v. Com., 10 Watts, 306 (1840), the court held that the building partly of brick and partly of wood was not included in legislation prohibiting the erection of wooden buildings. The court said: "If this were a remedial law, it might be construed liberally so as to effectuate the design of the legislature, which was to guard against the danger of fires in a populous city. But being a penal statute and this proceeding of a criminal case, the rule of law is well settled that such statutes are to be construed strictly and that no one is to be brought within the penalty of the act who is not within the plain meaning of the words strictly construed; and they are confined to wooden buildings only."

Similarly, in the Kebort case, *supra*, the court said: "It is a penal act creating an arbitrary and artificial crime, without reference to criminal intent, and must receive a strict construction with due regard to the popular comprehension."

In the case of Com. *v.* Exler, 243 Pa. 155, 162 (1914), the court said: "And right here we encounter the rule of interpretation that forbids any construction of a penal statute that would extend its meaning beyond its words. 'No person is to be made subject to a penal statute by implication; all doubts concerning their interpretation are to preponderate in favor of the accused:' Bishop's Criminal Law, § 225."

The principle is also clearly stated in this case that a criminal statute cannot be extended to cover situations which did not exist when the act was passed and which, therefore, the framers of the act could not have had in contemplation. The court says, at page 163: "Not only consonant with the rule just stated, but seemingly a corollary to it, we have another rule thus stated in Endlich on Interpretation of Statutes, § 325: 'Again, as illustrative of the rule of strict construction, it has been said that while remedial laws may extend to new things not *in esse* at the time of making the statute, penal laws will not. . . .' The same rule may be found in 26 Am. & Eng. Ency. of Law, 600, where it is thus stated: 'It has been held that penal laws should not be extended to new things which were not in being at the time when the laws were made, nor to offenses created and defined by subsequent statutes.' The authorities cited in the note to the text embrace English and American cases, and included among the latter is one of our own, Com. *v.* Wells, 110 Pa. 463, where this is said: 'And it was long ago ruled that a penal act of Parliament cannot be extended to things that did not exist when the statute was made.' "

As has been previously pointed out, at the time the Act of 1915 was passed, a mechanical device for the reproduction of language in synchronization with a moving-picture film had not been invented or probably contemplated. This fact, together with the fact that the legislature defined the word film to mean "what is usually known as a motion-picture film," leaves no possibility of doubt but that the act gave no authority to the board to censor language.

Indeed, the above statement is so clearly correct that the same conclusion is inescapable, whether the Act of 1915 be viewed merely as a remedial statute, to which the rule of reasonable construction should be applied, or as a penal statute, to which the rule of strict construction should be applied. There are approximately 20,000 motion-picture theatres throughout the United States. Of these theatres approximately 300 are equipped to and do exhibit films with the mechanical device for the reproduction of language in synchronization with the picture. It is clear, therefore, that this type of film or exhibition is even today distinctly unusual and that it could not reasonably be described as "what is usually known as a motion-picture film."

We wish also to cite the case of Mindlin *v.* O'Boyle, 278 Pa. 212 (1923), in which the court said: "A statute will not be construed as changing the common law beyond what is expressly stated or necessarily implied, and in doubtful cases the presumption is that no change was intended."

In ascertaining what is usually meant as a motion-picture film, as defined by the act, it is interesting to refer to Webster's New International Dictionary, in which the word "film" is defined as "the photographic film in the form of a flexible strip, used in making a motion picture." "Motion picture" is defined as "a series of pictures, usually photographs taken with a special machine, *presented to the eye* in very rapid succession, with some or all of the objects in the picture represented in successive positions slightly changed,

and producing, because of the persistence *of vision*, the optical effect of *a continuous* picture in which the objects move."

The first case in which the Act of May 15, 1915, P. L. 534, was considered by the Supreme Court was the case of Franklin Film Manuf. Corp., 253 Pa. 422 (1916). In that case, as there was no finding, in the opinion of the Court of Common Pleas, that the censors acted arbitrarily or were guilty of an abuse of discretion in ordering the eliminations in question, the Court of Common Pleas was reversed. The Supreme Court said, page 426: "The evident intent was to grant a right of appeal to the Common Pleas so that tribunal could correct any arbitrary or oppressive orders which the Board of Censors might make. . . ." The court also stated, at page 427: "When, after hearing, the court is convinced in any case that the censors have abused their discretion, the construction just placed upon the Act of 1915, *supra*, leaves ample power in the Common Pleas to see that the public is not denied proper entertainment and to protect property rights, a power which they should not hesitate to use when occasion requires."

The next case before the Supreme Court was Goldwyn Distributing Corp., 265 Pa. 335 (1919), the ruling of the Board of Censors was sustained because there was no finding of fact by the Court of Common Pleas which would support an inference that the board "rested its conclusion in the case on any ground not within the scope of its discretion." Concerning the scope of the discretion vested in the board, the court said, at page 342: "Such is the general rule when the exercise of discretionary power is complained of. 'The rule that a discretionary ruling is not reviewable on appeal does not apply where the decision complained of was not made in the exercise of discretion, but was based upon a question of power in the court below, or *upon some ground of law not involving discretion.* It follows that a decision is not unappealable as being discretionary where it was not made in the exercise of discretion, but was the result of *the refusal to exercise discretion.* In such cases, although there have been decisions to the contrary under particular statutes, the general rule is that the *onus* is upon the appellant to show affirmatively that the decision was made on a ground not involving the exercise of discretion:' 3 Corpus Juris, 471, § 289. The authorities cited in the note to the text show how widely and generally this rule is recognized and adopted." The Supreme Court also said in this case, at page 344: ". . . when the board has failed to exercise any discretion whatever, it is quite as much an abuse of its power as it would have been for it to act contrary to the express duty enjoined. So much may be granted."

In the case of Citizens Passenger Ry. Co. v. Public Service Commission, 271 Pa. 39 (1921), the court considered the scope of the authority of the Public Service Commission under the act which created it. The court said, at page 54: "The Public Service Company law, however, like all others not in the course of the common law and providing extra judicial remedies (even though the exercise of the jurisdiction conferred may ultimately be brought within the scrutiny of a court), *covers only such matters as are expressly or by necessary implication included within its terms.*"

In the case of Gemas's License, 169 Pa. 43 (1895), the lower court refused to grant a distiller's license because he found it unnecessary for the accommodation of the public. The Supreme Court said that although the granting of licenses was within the discretion of the Court of Quarter Sessions, "this discretion, as we have frequently said, is a judicial discretion, to be exercised for legal reasons and in a judicial manner." As the license in this case had been refused solely because it was alleged to be unnecessary for the accommo-

dation of the public, the Supreme Court said: "We are of the opinion, therefore, that the only reason assigned for a refusal of the license was not a valid reason under the statute in the case of a distiller, and unless there is other ground for refusing it, which does not appear, the license should be granted."

To the same effect are the cases of English's License, 59 Pa. Superior Ct. 629 (1915), and the case of Cambria County Brewers' License, 78 Pa. Superior Ct. 40 (1921).

In the case of Com. v. Shaffer, 52 Pa. Superior Ct. 230 (1913), the court reversed the action of a lower court in regard to the imposition of costs on the ground that the lower court had abused its discretion. The court said: "The phrase 'abuse of discretion,' as applied to judicial proceedings, does not necessarily imply a wilful abuse or intentional wrong. It may occur through an honest, though erroneous, opinion entertained by the court as to the nature and extent of its discretionary power and as to the legal principles governing its exercise. And where this is plainly made to appear to the appellate court, in a legitimate way, it may set aside the action complained of and remit the matter to the court of first instance, with direction to proceed according to the legal principles governing the judicial discretion committed to it."

The same principle has been applied in numerous other cases, including Fuel City Manuf. Co. v. Waynesburg Products Co., 268 Pa. 441 (1920); Waite v. Macy, 246 U. S. 606 (1918), and Stroh Products Co. v. Davis, 8 Fed. Repr. (2nd) 773.

In the case of Clicquot Club Co. v. United States, 13 Fed. Repr. (2nd) 655, the court, referring to the regulation of the Collector of Internal Revenue, said: "The regulation must be kept within the law. The administrative officers may not by regulations enlarge or abridge the obligations imposed by the statute. To exercise such power is to legislate, and not to regulate."

In the case of Hover v. Denver & R. G. W. R. Co., 17 Fed. Repr. (2nd) 881, the Circuit Court of Appeals, referring to a regulation of the Interstate Commerce Commission, said: "The commission cannot make or modify the law. Executive and administrative departments of the Government are required to keep within the limits of the power granted them by Congress."

The reason for the disapproval by the board of the film "She's Still My Baby" clearly appears in the order of disapproval. The only reason assigned is "that the said Fox Film Corporation has refused the request of the board to submit to it for its examination the language used by the actor in said picture. . . ." This statement is later supplemented by the statement that without the submission of such language the board cannot ascertain whether the picture is moral or proper. The latter statement, however, is merely the statement of a conclusion and in no sense the statement of a reason for the order of disapproval. There is no finding by the board that the film in question is sacrilegious, obscene, indecent or immoral. The limit of the board's authority, however, as defined in the act, is that the board *shall approve* such films as are moral and proper, and shall disapprove such as are sacrilegious, obscene, indecent or immoral. Nowhere in the act will be found any authority in the board to disapprove a film because the applicant has refused to submit to the board at its request the language used by the actor in the picture.

Not only is there a total absence of any authority contained in the act under which the board can compel the submission of language for its examination, but the title of the act, as above referred to, would clearly not support any such position. The title of the act, as we have previously pointed out, states that the act relates to motion-picture films, provides a system of exam-

ination, approval and regulation thereof, and of the banners, posters, etc., used in connection therewith, creates a Board of Censors, and provides penalties for violation of the act. It is a fundamental proposition that any provision in the act not included in the title would be unconstitutional. It is also obvious that the title of the act gives no notice whatsoever of any effort to confer jurisdiction on the Board of Censors over the utterances of the language, whether by mechanical device or by an individual in person.

Upon an application of the law as defined by the foregoing decisions to the facts of this case, the order of disapproval entered by the board upon the film in question was an arbitrary and oppressive abuse of its discretion; and in failing to approve said film, in the absence of a finding that the said film was immoral, indecent or obscene, it failed totally to exercise such discretion as was vested in it by the act.

The Pennsylvania State Board of Censors has no jurisdiction whatsoever to compel the submission to it for examination of such language as is to be used in conjunction with a motion-picture film; the regulation heretofore adopted by the Pennsylvania State Board of Censors and herein complained of has not been established in accordance with any power or authority conferred upon the board by the act which created it; the order of disapproval of the film "She's Still My Baby," which order was made because the appellant refused to submit to the board the language used in conjunction with the picture, and in the absence of a finding that said film is immoral, indecent or obscene, is an arbitrary and oppressive abuse of discretion, and the said order of disapproval is set aside and the appeal is sustained.

NOTE.—See In re Vitagraph, Inc., 11 D. & C. 45.